952 A.2d 226

# ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

## Ephraim C. UGWUONYE.

**Misc. Docket AG No. 8, Sept. Term, 2007.**

Court of Appeals of Maryland.

July 24, 2008.

352

Fletcher P. Thompson, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Attorney Grievance Commission of Maryland), for petitioner.

Bruce Marcus (MarcusBonsib, LLC), Greenbelt, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, and JOHN C. ELDRIDGE, (Retired, specially assigned), IRMA S. RAKER, (Retired, specially assigned), and DALE R. CATHELL, (Retired, specially assigned), JJ.

HARRELL, J.

The Attorney Grievance Commission of Maryland ("Petitioner"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Ephraim Ugwuonye ("Respondent") charging him with violations arising out of his representation of two former clients. The first set of alleged violations arise from his representation of Hassan Abdul–Rahim, Jr. in an employment discrimination matter. In that instance, Petitioner charged Respondent with violation of Maryland Rules of Professional Conduct (MRPC) 1.1 (Competence),[1] 1.3 (Diligence),[2] 1.4 (Communication),[3] 1.16(d) (Declin-

---

1. MRPC 1.1 provides:
 A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.
 All rules are reproduced in the form and content as of the date of public charging in this case, unless noted otherwise.

2. MRPC 1.3 provides:
 A lawyer shall act with reasonable diligence and promptness in representing a client.

3. MRPC 1.4 provides:
 (a) A lawyer shall:
 (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;
 (2) keep the client reasonably informed about the status of the matter;
 (3) promptly comply with reasonable requests for information; and
 (4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.

ing or Terminating Representation),[4] and 8.4(d) (Misconduct).[5] In the second case, Respondent was charged with violating MRPC 1.1 (Competence), 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer),[6] 1.3 (Diligence), 1.4 (Communication), 1.5 (Fees),[7] 1.15 (Safekeep-

---

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

4. MRPC 1.16 provides:
(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

5. MRPC 8.4 provides:
It is professional misconduct for a lawyer to:
. . . .
(d) engage in conduct that is prejudicial to the administration of justice . . .

6. MRPC 1.2 provides:
(a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of a the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify. (b) A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.
(c) A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent.
(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning, or application of the law.

7. MRPC 1.5 provides:

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be responsible whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

(d) A lawyer shall not enter into an arrangement for, charge, or collect:

(1) any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or custody of a child or upon the amount of alimony or support or property settlement, or upon the amount of an award pursuant to Md.Code, Family Law Article, §§ 8–201 through 213; or

(2) a contingent fee for representing a defendant in a criminal case:

ing Property),[8] 1.16(d) (Declining or Terminating Representation), and 8.4(d) (Misconduct), as well as Maryland Rule 16–604[9] and Maryland Code, § 10–304 of the Business Occupa-

---

(e) A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

(2) the client agrees to the joint representation and the agreement is confirmed in writing, and

(3) the total fee is reasonable.

8. MRPC 1.15 provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account, but only in an amount necessary for the purpose.

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(e) When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute.

Minor revisions to MRPC 1.15 became effective on 1 January 2008. These changes are not relevant to the analysis or outcome in the present case.

9. Rule 16–604 provides:

tions and Professions Article,[10] in the course of accepting as a client and representing Michael Etheridge regarding a claim for monetary damages against Montgomery County Crime Solvers, or possibly others, for supposed information-sharing of an unusual nature (to be explained later in this opinion).

We referred the matter to the Honorable Michael J. Algeo of the Circuit Court for Montgomery County to conduct an evidentiary hearing and render findings of fact and recommended conclusions of law regarding the alleged violations. The hearing occurred before Judge Algeo on 10, 11, and 31 January 2008. On 14 March 2008, he issued his Finding of Facts and Conclusions of Law.

### Findings of Fact

#### Complaint of Hassan Abdul–Rahim, Jr.

Hassan Abdul–Rahim, Jr. originally retained Respondent[11] in December of 2004 to represent him in the recovery of damages for injuries he claimed to have suffered in November of 2004, while working for United Parcel Service (UPS). In

---

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

**10.** Section 10–304 of the Business Occupations and Professions Article provides:

(a) General requirement. Except as provided in subsection (b) of this section, a lawyer expeditiously shall deposit trust money into an attorney trust account.

(b) Exceptions—Direction of court.—Subsection (a) of this section does not apply if there is a court order to the contrary.

(c) Same—Real estate transaction.—Notwithstanding subsection (a) of this section or any other law, a lawyer may disburse, at settlement in a real estate transaction, trust money that the lawyer receives in the transaction.

**11.** Respondent was admitted to practice law in Maryland in 1999.

February 2005, while on a hiatus from his work at UPS because of the November 2004 injuries, Rahim grew a beard. When Rahim returned to work at UPS, his supervisor asked him to shave off the beard. He refused, purportedly for religious reasons. Rahim alleged that the work environment became hostile towards him thereafter, pointing to a subsequent change by his employer in his working hours, which, he claimed, constituted religious discrimination.

Rahim filed an employment discrimination complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"). On 26 August 2005, the EEOC issued a right to sue letter. Rahim gave this letter to Respondent and requested that Respondent file suit on his behalf. According to the findings of fact rendered by Judge Algeo:

> Respondent instructed his associate, Raymond Jones, Esquire, to prepare the suit. [Rahim] was advised of the status of his case as he spoke with Mr. Jones by telephone on several occasions and he exchanged information with Mr. Jones. [Rahim] spoke with Mr. Jones more than anyone else in the office. Mr. Jones left several messages for the Respondent regarding conversations with [Rahim].

Jones prepared the suit and filed it with the U.S. District Court for the District of Maryland, Southern Division, on 28 November 2005. With regard to this suit, Judge Algeo noted:

> Respondent contends that [Rahim] understood that he would take no further action in his case after filing the suit. Respondent further contends that he communicated this limitation in a letter to [Rahim] dated November 28, 2005. [Rahim] contends that Respondent was to serve as his counsel throughout the case, and that he never received a letter from the Respondent communicating anything differently.

> The suit was filed with a signature line for Respondent only. The court issued a summons for UPS on November 30, 2005. The summons stated that the answer to the complaint should be served on Respondent as [Rahim's] attorney. On April 10, 2006, Ella S. Peterson, courtroom

deputy for the Honorable Peter J. Messitte, sent Respondent a notice stating that he should either file proof of service in the law suit or request an extension of time in which to achieve service. The notice directed Respondent to respond to the inquiry on or before April 24, 2006. Respondent took no action in response to the notice. On April 25, 2006, Complainant's case was dismissed without prejudice by Judge Peter J. Messitte as a result of the failure to serve the defendant. Although the case was dismissed without prejudice, the effect of the dismissal was to forever bar [Rahim] from bringing this suit again because pursuant to 42 U.S.C. § 2000e–5(f)(1) and 42 U.S.C. § 12117, such suits must be filed within ninety days of the issuance of a right to sue letter.

On or about 16 May 2006, Rahim and his wife visited Respondent at his office. On the same day, after their meeting, Respondent sent Rahim an e-mail:

Dear Hassan:

Following up on our meeting today, I shall communicate with you again on May 23, 2006 to give you further update on the two cases we have for you. If you do not hear from me on that date, please call my office immediately. Thanks a lot. EU

After receiving no communication from Respondent as promised, Rahim sent him the following e-mail on 26 May 2006:

Ephrium [sic], today is Friday may 26, 2006. I have not received the info about my case you promised. This is about the 13th time you told me you would contact me with any info on my case. The only info i have is "my case was dismissed without prejudice" which I received on my own inquire to the court. I flew to Maryland three times to speak to you without you without receiving any info. Only to receive Empty promises from you to contact me and forward me info pertaining to my case. You wonder why would Hassan have suspicions. I have called your office

three times since may 23 and you cell phone once with no response from you.

-Hassan Abdul Rahim, Jr.

On 30 May 2006, Rahim sent Ugwuonye another e-mail:

Dear Ephriam

Today is Tuesday, May 30, 2006, I still have not received any word from you or your assistants about the status of my case. This is a very stressful situation! I do realize cases like this take time but the courts are reporting my case as being dismissed without prejudice which proves that when you tell me everything is OK and your working on my case its not true! it is the same as when you promised me a phone call or report of the status of my case you are lying to me! Every time i call your office i am told that you are in Africa on a case or working with an important client! So i guess i am not a client worth the respect i deserve. I was promised to receive some info on may 23 2006 by you about my case once again i waited patiently and received nothing. Ive called your office four times since then and was told you were not avail and leave a message, no response to this day. What is a man to do? Any Advice? Hassan Abdul–Rahim, Jr.

Following Rahim's failed e-mail attempts to elicit a response from Respondent, Rahim sent a letter on 8 June 2006 terminating Respondent's services and asked him to have the client file ready for pick-up on 23 June 2006. On 20 June 2006, Respondent sent a letter to Rahim conveying an offer for $5,600.00 from Liberty Mutual Insurance, on behalf of UPS, for settlement of his claim. Two days later, on 22 June 2006, Rahim sent a reply to Respondent commanding that he cease and desist all actions on his behalf. This letter stated that Rahim previously was notified of, and rejected, the settlement offer from Liberty Mutual, and expressed doubt as to the authenticity of the current settlement offer. The doubt stemmed from Respondent's continuing failure to communicate with Rahim and his general neglect of the case.

### Complaint of Michael Etheridge

On 14 November 2005, in the Circuit Court for Montgomery County, Michael Etheridge, in proper person, filed suit against Montgomery County Crime Solvers. He alleged two bases for relief. First, Etheridge claimed that he was entitled to $500,000.00 as a reward for information that he provided concerning the Montgomery County Snipers.[12] Etheridge's second basis for relief alleged that he possessed information as to the whereabouts of Saddam Hussein and had relayed to the Montgomery County Crime Solvers that he possessed such information. Because he was unsure whether Montgomery County Crime Solvers would pay him for the information regarding Hussein (based on its previous refusal to pay $500,000.00 for the information regarding the Snipers), he asked for $12,500,000.00 in advance of supplying the Hussein information and another $12,500,000.00 upon the arrest of Saddam Hussein.

On 22 December 2005, Montgomery County Crime Solvers filed a motion to dismiss Etheridge's complaint. The motion was granted and an order to that effect was entered on 17 January 2006.

Frustrated by his inability to advance his claims for reward, Etheridge sought legal advice and representation. Etheridge originally was referred by a pro bono agency to an experienced attorney, Marvin Perlis. Perlis declined to take the case and instead referred Etheridge to Respondent. The record is silent as to whether Ugwuonye, a less experienced attorney, conferred with Perlis prior to accepting Etheridge as a client. According to the findings of Judge Algeo, Etheridge came to Respondent's office on 10 February 2006 and signed a retainer agreement stating:

---

**12.** The Snipers were two men, John Allen Muhammad and John Lee Malvo, who later were convicted for the murders of several individuals in numerous jurisdictions of the Washington Metropolitan area, which occurred throughout October of 2002. *See Muhammad v. State,* 177 Md.App. 188, 198, 934 A.2d 1059, 1065 (2007), *cert. denied,* 403 Md. 614, 943 A.2d 1245 (2008).

For his services to be rendered, I hereby agree to pay a non-refundable deposit of $3,500 being the minimum fee for attorney's availability to represent me in this case, and the legal fees as follows: "33% or 1/3 of all recovery based on successfully at trial, or 45% if case is lost and *client* elects to pursue [sic] an appeal."

Further, Judge Algeo determined that:

The agreement also provided that if Etheridge terminated Respondent's services "prior to the settlement of my claim or prior to judgment in court, the contingency nature of this retainer shall cease to apply and my attorney shall compute its professional fees on the basis of $250 per hour for the attorney and $100 per hour for the paralegal."

At the time of the signing of the retainer, Etheridge gave Respondent a cashier's check for $3,500. Respondent dispatched Leslie Riehm, his office manager at the time, to the Montgomery County Circuit Court directing her to obtain information on the case filed by Etheridge. In addition to retrieving documents from the court house, Ms. Riehm also testified that she assisted Respondent in identifying web sites and other relevant information for Respondent to review. As part of the research, Respondent attempted to locate and identify other instances where people had provided information to programs where awards had been offered and whether Montgomery County Crime Solvers had been involved in paying any citizens for information received.

After a preliminary review of Etheridge's claims as advanced in his unsuccessful lawsuit, Respondent determined that there was little, if any, likelihood that the trial court's judgment could be overturned. Nonetheless, Respondent accepted and deposited into his operating account, on either 10 or 11 June 2006, the $3,500.00 check given to him by Etheridge. Etheridge asked Respondent to look further into his claims. Testimony revealed that there were telephone conversations between Respondent, Riehm, and Etheridge in which Respondent advised Etheridge that his claims against Montgomery County Crime Solvers were not viable and that Re-

spondent intended to withdraw as Etheridge's attorney. Respondent did not file an appeal from the Circuit Court's judgment in Etheridge's case or seek reconsideration. Respondent eventually concluded that Etheridge's only recourse might be with regard to the capture of Saddam Hussein,[13] but Respondent took no action on Etheridge's behalf in that regard either.

In May 2006, Etheridge met with Respondent, at which time Respondent again indicated that there was little, if any, basis to support his claims. Respondent made no refund to Etheridge of any part of the $3,500.00 retainer. On 8 June 2006, Etheridge filed a complaint against Ugwuonye with the Attorney Grievance Commission.

### Conclusions of Law

#### Complaint of Hassan Abdul–Rahim, Jr.

██ Based on the finding of facts with respect to the complaint of Hassan Abdul–Rahim, Jr., the hearing judge concluded that Respondent violated MRPC 1.1.

During the early stages of the Respondent's representation, Mr. Rahim maintained contact with Mr. Jones in the Respondent's office, who kept him aware of the status of his discrimination case. This contact continued at least until February 2006, when Mr. Jones left the Respondent's office. The letter dated November 28, 2005, served to advise Mr. Rahim of the status of the case and his responsibilities as a litigant. Although Respondent claims that Mr. Rahim understood that he would no longer be representing him after filing the complaint, the Respondent never withdrew from the case and was counsel of record from the time the complaint was filed until the case was dismissed. Further, the Respondent acknowledged in a meeting with Mr. Rahim, months later in May of 2006, that he was handling two cases for Mr. Rahim, including the claim filed in November 2005.

---

**13.** Saddam Hussein was captured on 13 December 2003 in the cellar of a farmhouse located near the town of Tikrit in Iraq, a location of some distance from Montgomery County, Maryland.

In the months following the filing of the complaint, the Respondent received notices from the court requesting a response in order to avoid dismissal. Respondent made no effort to respond to these notices or inform Complainant of his need to respond. Respondent's inability to officially remove himself from the case, as well as, communicate correspondence from the Court to Mr. Rahim, displayed a lack of competence in his representation. For these reasons, the Court finds that the Respondent is in violation of Rule 1.1.

■ The hearing judge also concluded that Respondent violated MRPC 1.3. Although "Respondent was diligent in initially filing the complaint ... his failure to respond to subsequent notices from the court, and or communicate those notices to [Rahim], formed the basis for his violation." The hearing judge concluded that MRPC 1.4 was violated because Respondent failed to comply with reasonable requests for information and displayed an overall lack of communication with his client.

■ Lastly, the hearing judge concluded that MRPC 8.4(d) was violated by Respondent because

Respondent's failure to take any action in response to the notice of April 10, 2006 displays a lack of both competence and diligence. The notice advised the Respondent that Complainant's case would be dismissed unless he provided proof of service or requested an extension of time on or before April 25, 2006. Respondent took no action in response to the notice and as a result his client's case was dismissed. Contrary to what Respondent may have tried to communicate to Mr. Rahim back in November of 2005, Respondent never moved to withdraw from the case and was counsel of record from the time the lawsuit was filed until it was dismissed.

### Complaint of Michael Etheridge

The hearing judge concluded that the Respondent violated MRPC 1.1. Judge Algeo explained that "it [was] abundantly

clear that any competent counsel would have immediately declined to accept any such representation." Thus, by agreeing to undertake a case that patently had no merit, Respondent violated MRPC 1.1.

The hearing judge found that Respondent violated MRPC 1.3 because he owed Etheridge a duty to keep him informed about the developments in the representation and failed to do so. Respondent, therefore, did not exercise diligence in his representation of Etheridge. Additionally, according to the hearing judge, a violation of MRPC 1.4 occurred because Respondent displayed an "overall lack of communication by way of avoiding Mr. Etheridge with empty promises of prompt communications...."

As to MRPC 1.5, the hearing judge confirmed a violation because: (a) Respondent should have declined the case at the outset, and (b) the fee collected was unreasonable. As to MRPC 1.15, a violation occurred because Respondent deposited the unearned fee into an operating, instead of an escrow, account.

Judge Algeo concluded that Respondent was in violation of MRPC 1.16(d) because he failed to return the unearned fee upon termination of the representation. The judge concluded that "the service provided by the Respondent did not come close to warranting a fee in the amount of $3,500."

Lastly, the hearing judge concluded that Respondent was in violation of MRPC 8.4(d). Given the totality of Ugwuonye's actions; i.e., taking a meritless case, charging a fee that grossly outweighed the work accomplished, and the overall lack of communication with Etheridge, Judge Algeo concluded that Respondent was guilty of professional misconduct.[14]

---

**14.** The hearing judge expressed neither findings nor conclusions with respect to the charges of violations of MRPC 1.2, Rule 16–604, and § 10–304 of the Business Occupations and Professions Article. Petitioner filed no exception to the hearing judge's silence as to these charges. As such, these charges are not before us. *See Attorney Grievance Comm'n v. Zdravkovich*, 381 Md. 680, 684 n. 2, 852 A.2d 82,

### Standard of Review

 "This Court has original and complete jurisdiction over attorney discipline proceedings" in Maryland. *Attorney Grievance Comm'n v. Adams,* 349 Md. 86, 93, 706 A.2d 1080, 1083 (1998). Even though conducting an independent review of the record, we accept the hearing judge's findings of fact unless they are found to be clearly erroneous. *Attorney Grievance Comm'n v. Zdravkovich,* 375 Md. 110, 126, 825 A.2d 418, 427 (2003). This Court gives deference to the hearing judge's assessment of the credibility of witnesses. *Id.* Factual findings by the hearing judge will not be interfered with if they are founded on clear and convincing evidence. *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002). All proposed conclusions of law made by the hearing judge, however, are subject to *de novo* review by this Court. *Attorney Grievance Comm'n v. O'Toole,* 379 Md. 595, 604, 843 A.2d 50, 55 (2004).

### Exceptions

Respondent filed somewhat general written exceptions to the findings and conclusions expressed by the hearing judge with regard to his representation of Rahim. His exceptions regarding Etheridge's complaint are a bit more fulsome.

 With regard to Rahim, Respondent takes general issue with the findings articulated by Judge Algeo. The entirety of his exceptions notes that he

> takes issue with the findings and conclusions articulated by the trial court and in particular the finding to the violations of the Maryland Rules of Professional Conduct outlined in the Court's Conclusions of Law except to failing to appraise Complainant of the April 10, 2006 notice. Respondent submits that the Court's findings are unsupported by the facts of the case. As such, they are respectfully erroneous.

84 n. 2 (2004); *Attorney Grievance Comm'n v. Santos,* 370 Md. 77, 81–82 n. 12, 803 A.2d 505, 507 n. 12 (2002).

Respondent presents no argument in support of these general exceptions. "Failure to present argument in support of an exception is a sufficient basis on which to overrule the exception or, at least, not consider it." *Attorney Grievance Comm'n v. Barneys*, 370 Md. 566, 577, 805 A.2d 1040, 1046 (2002). Furthermore, we find that Judge Algeo's findings of fact and conclusions of law, with respect to the Rahim complaint, are supported amply by clear and convincing evidence in the record. Accordingly, we overrule these "exceptions."

With regard to the Etheridge matter, Respondent excepts to the findings and conclusions of the hearing judge relative to the violation of MRPC 1.1, contending that he was not in violation when he agreed to undertake representation of Etheridge regarding his claims against the Montgomery County Crime Solvers. Respondent contends that, although the account of the factual bases provided by Etheridge for his claims were both "fantastic" and "bizarre," there was no independent basis for automatically dismissing the claims and declining the representation.

Respondent also takes exception to the findings and conclusions of the hearing judge relative to the violation of MRPC 1.15, 1.5, and 1.16(d). Respondent contends that he expended over twenty hours investigating Etheridge's claims and that application of his hourly billing rate alone exceeded the $3,500.00 retainer. Thus, Ugwuonye contends that he rightfully utilized and deposited the retainer into his operating account and that Etheridge was not due any refund.

### Review of Conclusions of Law

We first examine Respondent's challenge to the asserted violation of MRPC 1.1 in Etheridge's matter for failing to decline a case lacking any merit. While admitting that Etheridge's claims were peculiar and extraordinary, Respondent contends that he had no independent, initial bases for automatically dismissing them. Applying a unique spin, Ugwuonye notes that Etheridge was referred to him by a seasoned and experienced attorney, implying, we suppose, some imprimatur of threshold worthiness of the case. He asserts

further that Etheridge appeared to be a sane and competent adult, was meaningfully employed, and recounted basic facts about the capture of the snipers and circumstances surrounding the whereabouts and capture of Saddam Hussein. Additionally, Respondent argues that attorneys cannot be charged with a "clairvoyant" and "instantaneous" ability to provide a thorough analysis and assessment of a new case prior to a reasonable opportunity to investigate. We overrule this exception.

In *Attorney Grievance Comm'n v. James*, 385 Md. 637, 662, 650, 870 A.2d 229, 244, 237 (2005), this Court held that the respondent had violated MRPC 1.1, in part, by representing a client in a tort action for damages against his wife's adulterer for the adulterous relationship he carried on with her. We observed that "even with cursory research [the respondent] would have found that tort damages are not allowed based upon adultery." *Id.* at 662, 870 A.2d at 244. Thus, the respondent failed to provide competent representation by undertaking the claim. *See id.* at 666, 870 A.2d at 246. Similarly, the hearing judge, in this case, concluded that, after ascertaining the fantastic bases of Etheridge's complaints, competent counsel would have declined representation immediately, as Mr. Perlis did. The judge observed that not only had undertaking representation of Etheridge regarding his claims against the Montgomery County Crime Solvers previously been declined by another attorney, but the Circuit Court for Montgomery County granted summary judgment against Etheridge in his earlier litigation of those claims. Taken together, these facts constitute clear and convincing evidence to support a conclusion that Respondent violated MRPC 1.1.

 We next examine Respondent's challenge to the asserted violations of MRPC 1.15, 1.5, and 1.16(d) regarding Etheridge's complaint. Respondent makes a general contention that he was not in violation of these rules because he expended over twenty hours investigating Etheridge's claims, as well as attempting to identify other possible sources of reward monies. Additionally, Ugwuonye contends that, at his

billing rate of $250.00 per hour, the actual services were valued at $5,092.00, based on the amount of time spent researching Etheridge's claims, excluding the additional investigative hours expended by his assistant. Thus, according to Ugwuonye, the $3,500.00 retainer was rightfully earned and utilized, apparently from the inception of the representation.

In *Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 504, 813 A.2d 1145, 1167 (2002), this Court found a violation of MRPC 1.15 where an attorney deposited his client's retainer into a personal account, rather than into a trust or escrow account. Likewise, in the present case, the hearing judge concluded that Respondent was in violation of the Rule because he deposited an unearned retainer into his operating account.

In the case of *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 359, 872 A.2d 693, 704 (2005), we found a violation of MRPC 1.15(a) where the respondent failed to keep client funds in separate accounts. In *Zuckerman*, we noted that while the respondent might not have violated purposefully the Rule, an unintended violation of MRPC 1.15 nonetheless was a violation of the attorney's duties as defined under the Rule. *Id.* at 370, 872 A.2d at 710. Although Respondent in the present case argues that he believed that he rightfully earned Etheridge's retainer fee, this does not excuse the fact that Respondent initially failed to deposit the retainer into a client trust or escrow account when the fee was unearned at the time it was received, especially in light of Ugwuonye's defense that Riehm's time did not figure in his computation of the amount of the legal fee claimed as ultimately earned. Thus, Respondent violated MRPC 1.15.

As to MRPC 1.5, Respondent contends that the amount of time he expended in researching Etheridge's claims exceeded the $3,500.00 retainer; thus, the fee was reasonable and rightfully utilized and deposited into his personal account. We overrule this exception.

In *Monfried*, we stated that "[c]ourts do not attempt to draw a bright line as to what constitutes a reasonable attorney

fee, nor are courts in the practice of setting attorney fees." *Monfried,* 368 Md. at 393, 794 A.2d at 103. Yet, in *Monfried,* we also noted that "[a] fee charged for which little or no work was performed [was] an unreasonable fee." *Id.* In that case, we held that an attorney's fee of $1,000.00 to meet with a client at his place of incarceration, to obtain a date for the client's hearing, and to represent the client at the hearing, was unreasonable in light of the fact that the respondent did little to no work for his client. *Id.* at 392, 393, 794 A.2d at 103.

In *Attorney Grievance Comm'n v. Guida,* 391 Md. 33, 52–53, 891 A.2d 1085, 1096 (2006), we held that a $735.00 attorney's fee for an adoption proceeding was unreasonable given that the respondent failed to perform services to any meaningful degree. In the present case, given the patently meritless nature of Etheridge's claims and the fact that Respondent accepted $3,500.00 and failed to perform meaningful services, the evidence is sufficient to support a MRPC 1.5 violation.

With regard to MRPC 1.16(d), Ugwuonye reiterates his running contention that the fee for representing Etheridge was earned because he did not err in accepting the case and spent over twenty hours researching the claims. Thus, Respondent reasons that, upon termination of representation, he was not under an obligation to return any part of the retainer. We overrule this exception.

As noted earlier, Respondent was in violation of the Maryland Rules of Professional Conduct when he agreed to represent Etheridge in his claims against Montgomery County Crime Solvers. Because Respondent demonstrated a lack of competence by failing to decline the representation, he was not at liberty to accept money from Etheridge for the representation. Any money he received with regard to representing Etheridge in his claims against Montgomery County Crime Solvers was unearned. Thus, Respondent was in violation of MRPC 1.16(d) when he failed to return the retainer ("unearned" money) when the representation was terminated.

### *Sanction*

■ We adopt the hearing court's findings of fact and conclusions of law as to Respondent's violation of MRPC 1.1, 1.3, 1.4, and 8.4(d), with respect to his representation of Abdul–Rahim. We conclude, with regard to his representation of Etheridge, that Respondent violated MRPC 1.1, 1.3, 1.4, 1.5, 1.15, 1.16(d), and 8.4(d). Petitioner recommends that Respondent be suspended from the practice of law for six months. Bar Counsel contends that this sanction is appropriate in light of Respondent's multiple and repetitive violations in the two matters. Respondent counters that nothing more than a reprimand is necessary or appropriate, given his lack of prior professional disciplinary history.

■ "The primary purpose in imposing discipline on an attorney for violation of the Rules of Professional Conduct is not to punish the lawyer but rather to protect the public and the public's confidence in the legal profession." *Attorney Grievance Comm'n v. Stein,* 373 Md. 531, 537, 819 A.2d 372, 375 (2003). "The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997). "[T]he gravity of misconduct is not measured solely by the number of rules broken but is determined largely by the lawyer's conduct." *Attorney Grievance Comm'n v. Briscoe,* 357 Md. 554, 568, 745 A.2d 1037, 1044 (2000) (citing *Attorney Grievance Comm'n v. Milliken,* 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998)). "The sanction for a violation of the Maryland Rules of Professional Conduct depends on the facts and circumstances of each case, including a consideration of any mitigating factors." *Attorney Grievance Comm'n v. Reinhardt,* 391 Md. 209, 223, 892 A.2d 533, 541 (2006) (citing *Zuckerman,* 386 Md. at 375, 872 A.2d at 713).

In the case at hand, the evidence does not support the notion that Respondent harbored dishonest or deceitful motives in his representation of either client. The facts suggest, however, that Respondent was negligent in client acceptance procedures (impugning his competence), failed to represent

diligently his clients, and failed to communicate with them in a timely manner. In *Attorney Grievance Comm'n v. David*, 331 Md. 317, 323–24, 628 A.2d 178, 181 (1993), we imposed a six month suspension on an attorney whose representation of four clients was characterized by serious neglect and inattention. In that case, the respondent failed to return unearned fees for a period of nine months, lacked communication with clients, failed to "timely remit funds he received on behalf of a client," and was uncooperative with Bar Counsel's request for information. *Id.* at 323, 628 A.2d at 181. *Attorney Grievance Comm'n v. Seiden*, 373 Md. 409, 425, 423, 818 A.2d 1108, 1117, 1116 (2003), resulted in a thirty day suspension for a respondent who was found to be in violation of MRPC 1.1, 1.5(a), 8.4(a), and 8.4(d). In fashioning that sanction, we noted that the respondent lacked the requisite intent to constitute intentional misappropriation and his actions were not dishonest or deceitful. *Id.* at 423, 818 A.2d at 1116.

Mitigating factors, if any, also frequently receive weight in the determination of the severity of the sanction selected. In *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 488–89, 671 A.2d 463, 483 (1996), we stated that

> [t]he mitigating factors listed in the ABA standard include: absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.

Respondent offers many remedial measures and procedures implemented in his practice since the middle of 2007, after the filing of the complaints that led to the present disciplinary case. These measures and procedures include engaging a senior and experienced attorney (interestingly, Mr. Perlis) to oversee daily operations of the firm, bi-weekly meetings to

review the calendar for the upcoming weeks and to address other issues the firm is facing, and a revised procedure for screening possible new cases. Also, Respondent notes that he implemented an improved process for termination of representation and now assigns two attorneys to each client's file to protect against delays in communication with the client and/or a court.

While we note that Respondent's violations are grave, they do not match in severity the situation in *David*. *David*, 331 Md. 317, 628 A.2d 178. Given that Ugwuonye did not act with dishonest, deceitful, or fraudulent intent, lacks a prior disciplinary record, made after-the-fact efforts to ameliorate the circumstances that led to a number of his violations of the Maryland Rules of Professional Conduct, and was cooperative with Bar Counsel throughout the investigation, we conclude that Respondent should be suspended from the practice of law for ninety days. This suspension shall commence thirty days following the filing of this opinion.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THIS COURT, INCLUDING THE COST OF TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761 FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST EPHRAIM UGWUONYE.**